UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JULIE LORD and
KIM HREN,

   Plaintiffs,

v.

GEN3 INTERCONNECT,

   Defendant.

File No.

Hon.

## COMPLAINT AND JURY DEMAND

## COMPLAINT

Plaintiffs Julie Lord and Kim Hren, by their attorneys, Pinsky Smith, PC, state as follows:

### Jurisdiction, Parties, and Venue

1. This is an action requesting the Court to remedy violations of the Americans with Disabilities Act (the "ADA"), the Michigan's Persons with Disabilities Civil Rights Act, MCL 37.1101 *et seq.* ("PDCRA"), the Age Discrimination in Employment Act ("the ADEA"), and Michigan's Elliot Larsen Civil Rights Act ((ELCRA").

2. In violation of these state and federal statutes, Defendant Gen3 terminated Plaintiffs on account of their ages.

3. Additionally and/or alternatively, Gen3 denied Ms. Hren reasonable accommodations, failed to engage in the interactive process to identify workable accommodations, retaliated against her for asking for accommodations, and ultimately terminated her on account of her disability.

4. This Court has jurisdiction over this Complaint under 28 U.S.C. §§ 1331 and 1367.

5. Plaintiffs are residents of Newago County, Michigan, and Kent County, Michigan, respectively, and both reside within the Western District of Michigan, Southern Division.

6. At all times relevant to this Complaint, Plaintiffs were Defendant's employees.

7. At all times relevant to this Complaint, Plaintiffs were within the age limits established by 29 U.S.C. §631.

8. At all times relevant to this Complaint, Plaintiff Hren had a disability as recognized under the ADA and the PDCRA.

9. Defendant is a for profit corporation, with its principal place of business in Kent County, Michigan, and doing business in the Western District of Michigan, Southern Division.

10. Defendant is an employer as recognized under the ADA, the PDCRA, the ADEA, and the ELCRA.

11. Venue is proper within this judicial district under 28 USC §1391.

## Statement of Facts

A.  *Background*

12. Defendant is a manufacturing company that produces wire harness components for use in marine and military applications.

13. Defendant employed Plaintiffs in the Production Department.

14. When they were interviewed, both Plaintiffs' ages were discussed as part of the hiring decision. The hiring manager, Ms. Melissa "Missy" Ramiro told Plaintiffs she sought to hire older, crafty women, and she believed they were perfect for the job.

15. Ms. Hren's disability was also known by Gen3 management, who promised to provide reasonable accommodations to her, and in fact did provide reasonable accommodations to her throughout employment and up until the same disability and need for accommodation served as the basis for Gen3's proffered reason for termination.

16. During her hiring process, Ms. Hren discussed her chronic back issues that resulted in her disability. Ms. Hren was diagnosed with bone spurs and arthritis, which she shared with Ms. Ramiro. She explained that, due to this disability, she was unable to stretch her arms out without proper elbow support, that she needed to sit often throughout her shift as well to avoid further complications, and that she was unable to do heavy lifting.

17. Ms. Ramiro indicated there were plenty of jobs that would allow Plaintiff to sit during her work and not to stretch her arms out, and that the company could easily accommodate her disability.

18. After her hire, Ms. Hren shared similar details and concerns about her chronic back problems with the other leads in manufacturing, including Ms. Katelyn Novakowski and Ms. Nichole Fredette.

19. Ms. Hren was repeatedly assured that Defendant could continue to accommodate her disability without issue. Indeed, as a reasonable accommodation, she was permitted to sit down to work and/or other minor accommodations that allowed her to continue working within the limitations of her disability.

20. Prior to termination, she also informed others in Gen3 management about her disability, specifically Chris Judge and Cody Thorington, during discussions about tasks outside of her job that she was willing to accept.

21. While employed by Defendant, Plaintiffs performed their duties in an entirely satisfactory manner. They each had virtually spotless records, without a single negative issue in either of their personnel files.

22. Plaintiffs had very positive relationships with all the leads in production, especially the lead of their production group, Ms. Fredette. They were willing to work hard for these leads as they believed the leads had their backs, and indeed, they did throughout most of Plaintiffs' employments.

23. Likewise, Plaintiffs were well respected and valued by their leads.

B.  *Changes at Gen3*

24. Things began to change when Defendant made changes in leadership in early 2022. At this time, Gen3 hired Chris Judge, who had a different attitude towards Plaintiffs. Upon information and belief, Chris Judge was a key individual in deciding to find a way to terminate Plaintiffs.

25. Around this same time, in early 2022, Defendant lost a large contract and needed to reduce its workforce.

26. Although Plaintiffs were initially hired to work primarily in wire harness construction, when the company began to cross train employees on different jobs, they willingly participated and actively sought additional training for other activities and stations.

27. Ms. Lord was cross trained on many activities and at many stations, and she never rejected a single opportunity to be trained or educated or otherwise prepared to handle any other activity or station for purposes of cross training.

28. Similarly, Ms. Hren was cross trained on many activities and at many stations, and she never rejected a single opportunity to be trained or educated or otherwise prepared to handle any other activity or station for purposes of cross training.

29. At some point in 2022, Gen 3 decided it needed to reduce its workforce and Defendant began forcing its leads to help determine whom to terminate, unbeknownst to the leads themselves.

30. At first, Defendant's management, including Mr. Judge and Human Resources Manager Paul Becker instructed production leads (Ms. Ramiro, Ms. Novakowski, and Ms. Fredette) to play somewhat of a game, in which they gave a simple thumbs up or thumbs down to individual employees to indicate whether we liked or disliked them as employees.

31. When they did not get the answers they wanted to terminate the people they wanted, Mr. Judge and Mr. Becker then asked the three leads to rate their team members from best to worst, allegedly based on objective criteria.

32. After the leads did so, Mr. Judge questioned their decisions and said he needed the leads to "clarify" their ratings—which mean that he intended to manipulate the outcomes of the rating process by giving explicit instructions to rate certain employees (specifically Ms. Hren and Ms. Lord) lower to ensure their terminations.

33. Upon information and belief, Plaintiffs' lead, Ms. Fredette, had originally rated them highly because of their positive attitudes, solid performance, and willingness to be flexible with job stations.

34. However, Judge superseded Ms. Fredette's evaluations of Mss. Hren and Lord as employees and instructed her to lower their ratings due to their ages and perceived physical limitations. He manipulated the ratings to force Ms. Fredette to rate them lower—low enough that Gen3 would terminate them.

35. Mr. Judge was specifically aware of Ms. Hren's accommodations. She reminded him of this multiple times, and she also reminded him the jobs that could have been completed while sitting down, allowing her to continue the accommodation Gen3

had been providing her. But he told her the company would no longer be willing to accommodate her or allow her to sit down for any period of time, regardless of the reason.

36. Mr. Judge refused to engage in any kind of an interactive discussion to determine what accommodations would have existed to allow Ms. Hren to continue working for Gen3.

37. Upon information and belief, many production leads did not believe Ms. Lord or Ms. Hren should have been terminated or fit the criteria for termination and they openly fought for Plaintiffs to remain employed.

38. On or around June 20, another member of Defendant's management, Mr. Cody Thorington, had individual meetings with certain employees to learn about their willingness to perform other tasks and work at other stations.

39. Upon information and belief, the sole purpose of these meetings, at least the Platiniffs' meetings, was to confirm Gen3's predetermined decisions to terminate.

40. During her meeting with Mr. Thorington, Ms. Hren reminded Mr. Thorington about her back issues, but she reiterated that she was trained and willing to perform every task within the production department besides operate and move the large, heavy wire spools. As long as she could continue to sit as needed and take breaks, she was willing and able to perform any and all other jobs. But she also stated that she'd even be willing to operate the wire spools if she that was needed.

41. During her meeting with Mr. Thorington, Ms. Lord also confirmed her willingness to work at any station and be cross trained on any activity except the

station that required moving large, heavy spools of wire. Still, Ms. Lord stated her willingness to operate the wire spools if that was needed of her as well.

42. Operating and moving the spools was one of more than a dozen tasks within the production area. It was mainly only handled by one specially trained person, along with an additional helper or two. Upon information and belief, Ms. Lord and Ms. Hren were not the only employees on the production team who were hesitant to be cross trained to operate the spools.

43. Upon information and belief, Gen3 used Plaintiffs' preference to avoid this one task as part of its justification to terminate them for illegal reasons.

44. Upon information and belief, Gen3 used the heavy spool operation that would be difficult for anyone to maneuver regardless of age and disability as a pretext to terminate Plaintiffs for illegal reasons.

45. Upon information and belief, Gen3 retained other employees who were younger and without disabilities, some of whom even had lower ratings or should have had lower ratings (but for Chris Judge's manipulations) than Plaintiffs.

46. On June 20, Gen3 permanently laid Plaintiffs off, effectively terminating them.

47. The day of the terminations, on June 20, 2022, owner Matt Borish called everyone to a large-group meeting. He explained that there were specific reasons for each person who was laid off that day. He said it was either because of issues with performance, attendance, or attitude.

## Statutory Prerequisite

48. Plaintiffs filed a charge of disability discrimination with the Equal Employment Opportunity Commission ("EEOC") within 300 days of the commission of the unlawful employment practice alleged herein.

49. Plaintiffs received a Notice of Right to Sue from the EEOC. (**Exhibit 1 and Exhibit 2**).

50. This action has been filed with 90 days of the receipt of Plaintiffs' Notice of Right to Sue.

## COUNT I – Violation of the Americans with Disabilities Act as to Plaintiff Hren

51. Plaintiff relies on the allegations of all prior paragraphs as if they were restated herein.

52. Defendant violated the ADA when it discriminated against and harassed Plaintiff on account of her disability, failed to provide her a reasonable accommodation, refused to engage in the interactive discussion to identify reasonable accommodations, retaliated against her for requesting one and/or for her disability, and ultimately terminated her.

53. As a result, Plaintiff has suffered and will continue to suffer harm.

## Relief

WHEREFORE, Plaintiff requests that the Court grant the following relief:

a) Award Plaintiff damages equal to lost earnings, benefits, and/or other compensation denied or lost to her by reasons of Defendant's illegal conduct, plus interest;

b) Award Plaintiff compensatory damages for mental anguish and emotional distress;

c) Award Plaintiff punitive damages;

d) Award Plaintiff's costs and reasonable attorney's fees;

e) Issue an order reinstating Plaintiff in an appropriate position; and

f) Award Plaintiff other relief as may be just and equitable.

## COUNT II – Violation of the Michigan's Persons with Disabilities Civil Rights Act as to Plaintiff Hren

54. Plaintiff relies on the allegations of all prior paragraphs as if they were restated herein.

55. Defendant violated the PDCRA when it discriminated against and harassed Plaintiff on account of her disability, failed to provide her a reasonable accommodation, failed to engage in any interactive discussion to identify possible reasonable accommodations, retaliated against her for requesting one and/or for her disability, and ultimately terminated her.

56. As a result, Plaintiff has suffered and will continue to suffer harm.

### Relief

WHEREFORE, Plaintiff requests that the Court grant the following relief:

a) Award Plaintiff damages equal to lost earnings, benefits, and/or other compensation denied or lost to her by reasons of Defendant's illegal conduct, plus interest;

b) Award Plaintiff compensatory damages for mental anguish and emotional distress;

c) Award Plaintiff exemplary damages;

d) Award Plaintiff's costs and reasonable attorney's fees; and

f) Award Plaintiff other relief as may be just and equitable.

## COUNT III – Violation of the Age Discrimination in Employment Act as to both Plaintiffs

57. Plaintiffs rely on the allegations of all prior paragraphs as if they were restated herein.

58. Plaintiffs seek legal and equitable relief regarding deprivation of certain rights secured by the Age Discrimination in Employment Act of 1967, the same being 29 U.S.C. §§ 621-634. Such relief is authorized under 29 U.S.C. § 626(b)(c).

59. Defendant violated the ADEA when it terminated Plaintiffs on account of age.

60. As a result, Plaintiffs have suffered and will continue to suffer harm.

## Relief

WHEREFORE, Plaintiffs requests that the Court grant the following relief:

a) Award Plaintiffs damages equal to lost earnings, benefits, and/or other compensation denied or lost to them by reasons of Defendant's illegal conduct, plus interest;

b) Award Plaintiffs compensatory damages for mental anguish and emotional distress;

c) Award Plaintiffs exemplary damages;

d) Award Plaintiffs' costs and reasonable attorney's fees; and

f) Award Plaintiff other relief as may be just and equitable.

### COUNT IV – Violation of the Elliot Larsen Civil Right Act as to both Plaintiffs

61. Plaintiffs rely on the allegations of all prior paragraphs as if they were restated herein.

62. Defendant violated the ELCRA when it terminated Plaintiffs on account of age.

63. As a result, Plaintiffs have suffered and will continue to suffer harm.

### Relief

WHEREFORE, Plaintiff requests that the Court grant the following relief:

a) Award Plaintiff damages equal to lost earnings, benefits, and/or other compensation denied or lost to them by reasons of Defendant's illegal conduct, plus interest;

b) Award Plaintiffs compensatory damages for mental anguish and emotional distress;

c) Award Plaintiffs exemplary damages;

d) Award Plaintiffs' costs and reasonable attorney's fees; and

f) Award Plaintiffs other relief as may be just and equitable.

Dated: May 6, 2024  PINSKY, SMITH, FAYETTE & KENNEDY, LLP
Attorneys for Plaintiff

By /s/ Crystal J. Bultje
Crystal J. Bultje (P80276)
146 Monroe Center, N.W., Suite 418
Grand Rapids, MI 49503

14 | Page

## JURY DEMAND

To the extent jury trial is allowed with regard to any of the issues herein, Plaintiffs demand the same.

Dated: May 6, 2024

PINSKY, SMITH, FAYETTE & KENNEDY, LLP
Attorneys for Plaintiff

By /s/ Crystal J. Bultje
Crystal J. Bultje (P80276)
146 Monroe Center, N.W., Suite 418
Grand Rapids, MI 49503
(616) 451-8496